**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THOMAS H. MANN, et al., individually and on behalf of PARAMUS MALL CHEVROLET-GEO, INC. AND PARAMUS HUMMER, LLC** | Civ. No. 11-1679 (KM)(SCM) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **THE ESTATE OF EUGENE C. MEYERS, ET AL.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

### I.    Introduction

Thomas Mann worked at Paramus Auto Mall ("PAM"), a car dealership, from December 1995 through April 2010. The majority shareholder and dealer-operator of the PAM dealership was Eugene Meyers, who is now deceased. Mann claims that Meyers and his successors took several actions that damaged Mann either as an employee or as a shareholder of PAM. As an employee, Mann alleges that Meyers wrongfully terminated him because of his age. As a shareholder of PAM, Mann alleges that Meyers and his successors transferred PAM's Hummer franchise to another corporation, usurping an opportunity that rightfully belonged to PAM; that Meyers purchased the real estate on which PAM was located, usurping another corporate opportunity; that ~~Meyers diverted to another corporation certain bonuses that PAM~~

received from General Motors; and that Meyers's heirs wrongfully withheld a profit distribution owed to Mann in 2010.

Many of the same allegations were made in a prior lawsuit[1] filed in 2008 by another minority shareholder who worked for PAM, Ronald Barna. Barna was largely successful in his lawsuit. The arbitrator found that Meyers and his successors were liable to Barna and to PAM. *See* Sections I.C, III.A.2, *infra.* Mann, however, was not a party to the Barna lawsuit. He instead filed this action in March of 2011.

Before this Court are four motions for summary judgment. The motions concern two topics: Mann's claims of age discrimination, and the potential collateral estoppel effect of the prior judgment in Barna's lawsuit.

In the age discrimination motions, Meyers's estate argues that Meyers, an individual, is not a proper defendant under federal discrimination laws. Meyers's estate and PAM also argue that Mann does not qualify as an "employee," and therefore possesses no viable claim for age discrimination. In addition, Meyers's estate and PAM argue in separate motions that they should be granted summary judgment on the merits with respect to the age discrimination claims.

In the collateral estoppel motions, Mann seeks to use findings from the Barna litigation against the defendants in this case. The Fernandez defendants, too, argue that certain findings from the Barna litigation should collaterally estop Mann here.

---

[1]     For simplicity, I refer to actions brought in court, referred to arbitration, and later confirmed, as "lawsuits."

## II.  Factual Background[2]

[2]     Citations to the record will be abbreviated as follows:

Prior Opinions and Orders

Interim Award by Judge Keefe dated January 10, 2013, 73-2, Exh. C; "Interim Award".
Post-Arbitration Motion Opinion dated February 12, 2013, 73-2, Exh. D; "February 2013 Post Arbitration Motion".

Briefs

Brief on Behalf of the Estate of Eugene C. Meyers and Melody Paton, in her capacity as executrix of the Estate of Eugene C. Meyers, In Support of the Motion for Partial Summary Judgment Dismissing the Eleventh, Twelfth, Thirteenth and Fourteenth Counts of the Second Amended Complaint; No. 72-1; "Estate Defendants ADEA Motion".
Defendant, Paramus Auto Mall's Brief in Support of Motion for Summary Judgment, No. 71-4; "PAM ADEA Motion".
Plaintiff's Brief in Opposition to 1) the motion for partial summary judgment filed by the Estate Defendants, and 2) the motion for summary judgment filed by Paramus Auto Mall Chevrolet-GEO, Inc.; No. 79; "Mann ADEA Brief".

Plaintiff's Brief in Support of Motion for Partial Summary Judgment to Apply Collateral Estoppel to an Arbitration Award and Order Confirming Arbitration Award, 73-7, "Mann Estoppel Brief".
Estate Defendants' Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment; 82-1; "Estate Def. Coll. Estop. Brief".
Plaintiff, Thomas H. Mann's Brief in Reply to the Estate Defendants' and Paramus Auto Mall Chevrolet-GEO, Inc.'s Opposition to Plaintiff's Motion for Partial Summary Judgment; 87; "Mann Reply Brief on Coll. Estop.".

Defendant Antonio Fernandez, Cadillac of Mahwah, LLC, GM-Pontiac of Mahwah, LLC and Hummer of Mahwah Realty, LLC's Memorandum of Fact and Law in Support of Summary Judgment, ECF No. 70-3; "Fernandez Motion".
Brief in Opposition to First Motion for Summary Judgment, 80; "Mann Response to Fernandez Motion".

Depositions

Deposition of Thomas Mann, November 24, 2009; No. 72-2, Exh. A; "Mann 2009 Deposition".
Deposition of Thomas H. Mann, August 1, 2013; No. 71-2, Exh. 1; "Mann 2013 Deposition".

Deposition of Eugene C. Meyers, August 6, 2009 – No. 79-7, Exh. B; "Meyers Deposition".

## A. Employment and shareholder status

Meyers recruited Mann to work at Paramus Auto Mall in December 1995. *See* Mann 2013 Deposition, 7. Initially hired as a finance and insurance manager, Mann eventually became general manager and general sales manager. *See* Mann 2013 Deposition, 7, 14.

Over the course of his employment, Mann also came to own nearly 10% of the shares of PAM. *See* Mann 2009 Deposition, 15-16, 30-33. Mann did not pay cash for any of his shares; they were "awarded" to him by Meyers. *See* Mann 2009 Deposition, 15-16 and 31-32; Mann Stmt Undisputed Facts, ¶ 12. Until his death in 2010, Meyers was the

---

Deposition of Kevin Hanley, October 22, 2013, 72-2, Exh. E.; "Hanley Deposition".

Declarations

Declaration of Thomas H. Mann, December 2, 2013 – No. 73-5. "Mann 2013 Declaration".
Supplemental Declaration of Thomas H. Mann, January 9, 2014; 79-4; "Mann 2014 Declaration".
Declaration of Mary Ann Rosso; 79-2; "Rosso Declaration".
Declaration of George Armanico; 79-1; "Armanico Declaration".
Declaration of William Mann; 79-3; "William Mann Declaration".

Statements and other Filings

Second Amended Complaint, No. 41; "Complaint".
Barna's Fourth Amended Complaint, June 24, 2011, 73-1, Exh. B ("Barna Complaint").

Mann Statement of Undisputed Material Facts, 73-6; "Mann Stmt Undisputed Facts".

Mann Response to the Estate Defendants' Statement in Support of its Motion for Summary Judgment; No. 79-11; "Mann Counterstatement".
Estate Defendants' Response to Plaintiff's Additional Statement of Material Facts; No. 85-1; "Estate Defendants' Response".

---

Statements Regarding Tom Mann; 72-2, Exh. D; "Statements Regarding Tom Mann".

majority shareholder of PAM, always owning at least 67% of the outstanding shares. *See* Mann Stmt of Undisputed Facts, ¶7-14.

## B. Background of Mann's Claims as a Shareholder

### 1. Hummer franchise

PAM was a General Motors dealership which, until about 2002, sold Chevrolets. In 2001 or 2002, GM granted PAM a second franchise that entitled it to sell GM's Hummer vehicles. *See* Interim Award, 4; Mann 2013 Declaration, ¶¶ 14-15. For that purpose, Meyers formed a corporation called Paramus Hummer, LLC, of which he owned 50%, and Mann and Ronald Barna each owned 25%. *See* Mann 2013 Declaration, ¶ 15. Mann and Barna operated the new Hummer franchise, managing it much as they had managed the Chevrolet business. *See* Mann 2013 Declaration, ¶¶ 14-17. Hummer became the "highest grossing vehicle on PAM's lot" and "one of the most successful Hummer dealerships in the United States." *See* Interim Award, 4.

In January of 2007, Meyers transferred the Hummer franchise to a new corporate entity called Hummer of Mahwah, LLC. Meyers dissolved Paramus Hummer LLC. PAM received no compensation in connection with the transaction. Meyers thereafter stopped selling Hummers at PAM, and instead sold them from a new location in Mahwah, New Jersey. *See* Interim Award, 5-6.

GM had an incentive program wherein it provided cash awards to dealerships that had exemplary Hummer sales and customer satisfaction. *See* Interim Award, 6-7. From 2004 through the end of 2006, GM issued $1,355,000 in such "Standards for Excellence" or "SFE" bonuses based on Hummer sales at the PAM dealership. *See* Interim Award, 6-7, 17. GM held the bonus money in escrow pending the completion of the new Mahwah Hummer dealership. *See* Interim Award, 7. After Meyers moved the Hummer operations to Mahwah in 2007, GM

released the SFE bonus money to Mahwah Hummer. *See* Interim Award, 7. None of the bonus money was paid to PAM. Interim Award, 7.

### 2. 194 Realty

PAM is located at 194 Route 17 in Paramus, New Jersey. *See* Interim Award, 7. Although the dealership itself is owned by PAM, the property on which the dealership is located was formerly owned by a subsidiary of General Motors. *Id.* In 2007, GM "expressed an interest in selling the property." *Id.* at 18. Meyers purchased the property through an entity called 194 Realty, LLC. *Id.* at 7. Meyers did not offer or share the opportunity to purchase the property with PAM or with its shareholders. *Id.* at 7-8. The purchase price of the property in 2007 was $6.9 million; by August 2009, the property was appraised at $13.3 million.

### 3. 2010 bonuses

PAM paid a bonus to Mann every year from 2002 through 2009, and to Barna from 1995 through 2009. *See* Interim Award, 26-27, 10. In 2010, after Meyers's death, PAM was being run by Melody Paton, the executrix of Meyers's estate and co-trustee of his trust. *Id.* at 9. In December 2010, Paton announced that there would be no bonuses that year. GM, she explained, was requiring improvements to the PAM facility, and she would need to devote a substantial amount of cash to that. *Id.* at 10. That same year, however, Paton arranged a $2 million loan from PAM to the Meyers estate, with which the estate paid "its estate and income tax liabilities." *Id.* at 11.

### C.   Background of Collateral Estoppel Claims: Barna Lawsuit

Like Mann, Ronald Barna worked at PAM and held a minority interest in the corporation. In 2008, Barna brought suit against Meyers and others alleging various causes of action arising from the transactions

6

described above. *See* Barna Complaint. Barna also alleged that his termination in April 2010 was wrongful, although, unlike Mann, he did not allege age discrimination. *Id.* That suit was referred to, and ultimately decided by, an arbitrator. *See* Interim Award. The arbitrator issued an "interim" award and three "Post Arbitration Motion Opinion[s]." *See* 73-2, Exhs. C, D, E. The Chancery Division of the Superior Court of New Jersey held a hearing on the issue of whether to confirm the arbitration award. *See* 82-8, Exh. U. The Superior Court confirmed the arbitration award on April 15, 2013. *See* 73-2, Exhs. F, G. Part of the arbitrator's decision ordered the Estate defendants to pay Barna approximately 19% of the value of the Hummer franchise as of the date it was transferred out of PAM. *See* Interim Award, 16-17. The decision provided that the value of the franchise as of that date, January 1, 2007, would be estimated by a valuation expert, and evaluated by the arbitrator. *Id.* at 17. That valuation was subsequently performed. The arbitrator issued a final award incorporating the the valuation, and that award was confirmed by the New Jersey Superior Court. *See* 104-1, Exhs. A, B.

Further details of the arbitration award are discussed below at Section III.A.2.

### D. Background of Age Discrimination Claims

Mann alleges that, beginning in July 2008, Meyers began making derogatory written and oral statements about Mann's age. *See* Mann 2013 Deposition, 19. On an "almost daily basis," Meyers would comment that Mann was too old to run the dealership, was "all washed up," and should retire. *See* Mann 2014 Declaration, ¶¶ 4-5; 79-2, ¶ 3. Meyers also allegedly wrote disparaging comments on objects in Mann's office almost daily for approximately 600 days. *See* Mann 2013 Deposition, 38. Meyers

terminated Mann's employment on April 24, 2010. *See* Mann 2013 Declaration, ¶ 36.

## III.    Discussion

### A.    Collateral Estoppel (Motions 70 and 73)

Before this action was filed, Ronald Barna sued the Estate defendants[3] and the Fernandez defendants.[4] Barna's lawsuit, which asserted many of the same claims that Mann makes here, was largely successful. In a motion for summary judgment, No. 73, Mann seeks a ruling estopping the Meyers defendants from contesting in this action five issues decided by the arbitrator in the Barna action:

1) Transferring the Hummer franchise to a different corporation without compensating PAM shareholders constituted misappropriation of a corporate asset. *Id.* at 30.

2) The failure to deliver the SFE bonus money to PAM was wrongful. *id.* at 20, 31;

3) Meyers' purchase (through 194 Realty) of the property on which PAM operates constituted a misappropriation of a corporate opportunity. *Id.* at 31-32.

4) Failing to distribute a bonus in 2010 was an act of bad faith. *Id.* at 29.

5) Barna was terminated without just cause. *See* Mann Estoppel Brief, 28-29.

---

[3] The "Estate Defendants" are The Estate of Eugene C. Meyers, Melody Paton (the executrix of the Meyers Estate), and The Eugene C. Meyers Revocable Trust.

[4] The "Fernandez Defendants" are Antonio Fernandez, Hummer of Mahwah, LLC, Cadillac of Mahwah, LLC, GM-Pontiac of Mahwah, LLC, and Hummer of Mahwah Realty, LLC. See Section III.A.4, *infra.*

The Fernandez defendants make a separate motion, No. 70, to invoke collateral estoppel against Mann. That motion is discussed in section III.A.4, below.

### 1. Standard for applying collateral estoppel

Whether a state court judgment should have a preclusive effect in a subsequent federal action depends on the law of the state that adjudicated the original action. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir. 1999) ("To determine the preclusive effect of [the plaintiff's] prior state action we must look to the law of the adjudicating state."); *Bouriez v. Carnegie Mellon University*, 430 F. App'x 182, 186 (3d Cir. 2011) (applying Pennsylvania law to decide whether to give preclusive effect to a Pennsylvania state court decision). That requirement arises from the Full Faith and Credit statute, which commands that federal courts recognize and honor state court judgments. 28 U.S.C. § 1738 (the "judicial proceedings of any Court of any such State... shall have the same full faith and credit in every court within the United States... as they have by law or usage in the courts of such State...from which they are taken."). *See also Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so."); *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir. 1988).

The judgment as to which Mann invokes collateral estoppel is an arbitral award, decided in New Jersey and confirmed by a New Jersey state court. To decide his motion, I must determine whether and to what extent New Jersey law would give that ruling preclusive effect.

New Jersey courts will give preclusive effect to an arbitration award, particularly one confirmed by a court. *See Barker v. Brinegar*, 788 A.2d 834, 838 (App. Div. 2002) ("In appropriate circumstances,

9

arbitration awards may be given collateral estoppel effect in subsequent judicial proceedings."); *Carino v. Allstate Fin. Servs., LLC*, No. A-5717-09T4, 2011 WL 1364150, at \*3 (N.J. Super. Ct. App. Div. Apr. 12, 2011) ("An arbitration award has the same effect under the doctrine of res judicata as a judgment of the court."). An arbitral award will be given preclusive effect if it was "rendered in proceedings which merit such deference." *Konieczny v. Micciche*, 702 A.2d 831, 836 (App. Div. 1997).

In deciding whether an award merits deference, the "essential question" is

> whether an issue is formulated as it would be in a court and decided according to procedures similar to those of a court. An issue of fact is so formulated when there is assertion and controversion of the occurrence of a legally significant event. If an issue has thus been formulated, and if the procedure for resolving it is substantially similar to that used in judicial adjudication, the determination of the issue should be given preclusive effect in accordance with the rules of res judicata.

*Id.* at 836 (internal citations, quotations, and alterations omitted).

There is no real dispute as to the adequacy of the arbitration procedures in the Barna case. The arbitration proceedings occupied ten days over the course of several months. *See* Fernandez Motion, 19. The arbitrator heard testimony, reviewed depositions, and issued an initial opinion of some length, followed by several post-award opinions. *See* 73-2. Exhs. C – E. The arbitration award was confirmed by the Chancery Division of the Superior Court of New Jersey. *See* 73-2, Exh. G. This Court can therefore confidently grant it preclusive effect, provided that it meets the usual criteria for invoking collateral estoppel.

In New Jersey, a party seeking to invoke preclusion must show that:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding;
> ~~(2) the issue was actually litigated in the prior proceeding;~~
> (3) the court in the prior proceeding issued a final judgment on the merits;

> (4) the determination of the issue was essential to the prior
> judgment; and
> (5) the party against whom the doctrine is asserted was a
> party to or in privity with a party to the earlier proceeding.

*Winters v. N. Hudson Reg'l Fire & Rescue*, 50 A.3d 649, 659 (N.J. 2012)
(line breaks added for clarity).

Even where these five criteria are met, however, the court retains discretion to grant or deny preclusion. *State v. Schlanger*, 496 A.2d 746, 749 (Ch. Div. 1985) ("The extent of use through collateral estoppel or by other methods of issue preclusion rests squarely within the discretion of the civil tribunal."). Specifically, courts are to ensure that preclusion is fair. "The application of offensive collateral estoppel is a discretionary matter for the court and as a rule of efficiency should not be applied unless the court is fully satisfied with its fairness." *Kortenhaus v. Eli Lilly & Co.*, 549 A.2d 437, 439 (N.J. App. Div. 1988) (internal citations omitted).

> Fundamental to the application of estoppel is an assessment
> of considerations such as finality and repose; prevention of
> needless litigation; avoidance of duplication; reduction of
> unnecessary burdens of time and expenses; elimination of
> conflicts, confusion and uncertainty; and basic fairness.
> Indeed, such broader notions about fairness and finality
> echo in the variety of considerations that equity applies in
> estoppel-like circumstances.

*Winters*, 50 A.3d at 659 (internal quotations and citations omitted).

### 2. Application of five-part New Jersey collateral estoppel test to the facts of this case

Barna filed suit on September 24, 2008 in the Chancery Division of Bergen County (Case No. C-377-08). He ultimately named as defendants the Meyers Estate, the Meyers Trust, PAM, Paramus Hummer, Hummer of Mahwah, Pam Realty, 194 Realty, Antonio Fernandez, various minority shareholders of PAM, and Melody Paton (as the executrix of the Meyers Estate). *See* Barna Complaint, 1. The matter was referred to arbitration

before Judge John A. Keefe (ret.). *See* Interim Award, 1. The Arbitrator issued an award, designated an "Interim Award," pending the completion of a valuation of Paramus Hummer and certain financing arrangements. *See* February 2013 Post-Arbitration Motion, 3, 7, 25. In rendering his award, the Arbitrator made findings of fact in five areas:

(1) With respect to the moving of the Hummer franchise (*see* Section II.B.1, *supra*), Judge Keefe found that General Motors had, in fact, granted the Hummer franchise to PAM, not to Meyers. Because the franchise was the property of PAM, transferring it to another corporation without compensating PAM constituted misappropriation of a corporate asset and oppression of PAM's minority shareholders. *See* Interim Award, 16. At the time that Meyers misappropriated the Hummer franchise from PAM, Barna had owned a 19.277% interest in PAM. *Id.* Judge Keefe therefore ordered that Barna be awarded 19.277% of the value of the Hummer franchise as of the date it was transferred to Mawhah Hummer. *Id.* at 16-17. He ordered an accountant to perform a valuation of the franchise. *Id.* at 17.

(2) Judge Keefe also made findings with respect to the "SFE" bonus money that GM had paid as a reward for PAM's Hummer sales. (*See* Section II.B.1, *supra*). Judge Keefe found that this money had been "earned by PAM during the years 2004, 2005, and 2006." *See* Interim Award, 17. Meyers, Judge Keefe found, had diverted that money to Hummer of Mahwah. *Id.* Judge Keefe found that this money should be treated as a loan from PAM to Hummer of Mahwah, and should be paid back to PAM with interest at a rate of 2% per annum until the date of repayment. *Id.* Judge Keefe found that Mahwah Cadillac was not liable for any portion of the funds. *Id.*

(3) Judge Keefe made findings with respect to Meyers's purchase, through 194 Realty, of the property on which PAM operates. (*See* Section II.B.2, *supra*.) Judge Keefe found that by failing to share this opportunity

12

with PAM, Meyers misappropriated a corporate opportunity that would have been in the best interests of PAM shareholders. Judge Keefe ordered the creation of a constructive trust over the property. *See* Interim Award, 20. He ordered that stock in 194 Realty, LLC be transferred to Barna and Mann in proportion to their stock holding in PAM. *Id.* at 21.[5]

(4) With respect to the 2010 bonuses (*see* Section II.B.3, *supra*), Judge Keefe found that the decision to use PAM profits to pay income taxes was generally a sound one. *See* Interim Award, 27. However, Paton took a disproportionate amount of money from PAM, as compared to the other dealerships. *See* Interim Award, 27. Judge Keefe found that Paton did this because Barna had opposed some of Meyers's decisions. *Id.* Judge Keefe found that this constituted bad faith. *Id.* Judge Keefe found that Paton should have distributed 21% of PAM's net profits to its shareholders (a total of $657,119). *Id.* at 28. Of that, Judge Keefe awarded Barna 20%, which is roughly equivalent to Barna's percentage share ownership of PAM at the time.

(5) Judge Keefe also made findings about Meyers's termination of Barna. (*See* Section II.C, *supra*.) Barna had been terminated from PAM in September of 2010. Barna argued that, under New Jersey law, his position as shareholder manager could be terminated only for cause. *Id.* at 23. Judge Keefe agreed, and found that cause for termination was lacking. *Id.* at 22. As a remedy, he ordered that Barna should have the opportunity to "buy out all of the outstanding shares of PAM, held either by Meyers's Estate or the Meyers's Trust." *Id.* at 24-25.

Do those findings meet New Jersey's five-part test for invoking preclusion? *See Winters,* 212 N.J. at 85, cited in Section III.A.1, *supra*. As to the first three of those findings, the answer is yes; as to the last two, the answer is no.

---

[5]    This relief was conditioned on 1) Assent by Mann; 2) Mann and Barna either guaranteeing the existing mortgage on the property or finding alternative financing to effect the same result.

*Element One.* I consider first whether the issue as to which preclusion is sought is identical to the issue decided in the prior Barna judgment. As between the two actions, three sets of factual issues are identical: (1) the moving of the Hummer franchise; (2) the SFE bonus money; and (3) the purchase (through 194 Realty, LLC) of the property on which PAM operates. With respect to (4) the 2010 bonuses and (5) the termination of Barna, however, the issues are not identical.

With respect to moving of the Hummer franchise, Judge Keefe found that Meyers had wrongfully transferred the franchise to another corporate entity without compensating PAM. This is precisely what Mann alleges in his Complaint here. *See* Complaint ¶¶ 31-52 and First through Tenth Counts. With respect to the SFE money, Judge Keefe found that PAM earned bonuses from GM for Pam's Hummer sales, and that Meyers diverted those funds to another corporation without compensating PAM. *See* Interim Award, 17. Mann's Complaint here alleges the same conduct. *See* Complaint ¶¶ 44, 45, 49(d). With respect to purchasing 194 Realty, Judge Keefe found that Meyers had failed to share the real estate opportunity with PAM, and that this constituted a misappropriation of a corporate opportunity. Mann's Complaint here alleges the same conduct and the same cause of action. *Id.* at ¶¶ 59-65; Sixth and Ninth Counts.

Each of those claims, although initially asserted only by Barna, alleges a wrong and an injury common to the minority shareholders of PAM. For these three transactions (the moving of the Hummer franchise, the SFE money, and 194 Realty) the issues are identical and the first prong of New Jersey's test for preclusion is satisfied.

Judge Keefe's findings as to the 2010 bonus money are not identical to those asserted here, however. Judge Keefe found that Paton, in bad faith and in retaliation for Barna's opposition to certain of Meyers's decisions, drained cash from PAM to pay the Meyers estate's taxes. *See* Interim Award, 27. The bad faith aspect is, to some degree,

14

unique to Barna. More fundamentally, however, Mann does not seem to be alleging a similar claim here. Mann's complaint does ask generally that the court award him "all bonuses and company profits wrongfully withheld him by Meyers, Paramus Chevrolet, and Paramus Hummer." *Id.* at 25. But he makes no specific allegation that Paton or PAM wrongfully withheld profits, in 2010 or at other times, in order to retaliate against Barna. As to this aspect of the case, the issues are not identical.

Judge Keefe's findings with respect to the termination of Barna, too, are not applicable here. Judge Keefe found that Barna was not terminated for cause. *See* Interim Award, 22. Mann argues that this finding should be applied to his own termination as well. *See* Mann Estoppel Brief, 28. The issues, however, are not identical. Barna and Mann were terminated separately. Barna managed the service center; Mann managed the sales center. Mann primarily alleges age discrimination; Barna did not. Mann was 62 when he was hired; Barna was much younger. Barna had filed a lawsuit against Meyers and PAM at the time he was fired; Mann had not. In short, Barna's termination without cause or in retaliation for his own acts does not imply that Mann was terminated without cause or based on his age. The issues are not identical, and it would not be appropriate to give Barna's not-for-cause termination preclusive effect here.

On the first element of collateral estoppel, then, the issues are reduced to three. I consider the other collateral estoppel elements as to those remaining three issues.

*Element two.* The next prong of New Jersey's test for collateral estoppel asks whether the common issues were actually litigated in the earlier action. All three issues— the moving of the Hummer franchise, the SFE money, and the purchase of the property on which PAM operates—were actually litigated in the arbitration. All were alleged in the Barna complaint. The arbitration occupied ten trial days. *See* Fernandez

15

Motion, 19. The arbitrator heard testimony and reviewed depositions. He issued an initial opinion of some length, followed by several post-award opinions, in which these three issues were decided in Barna's favor. *See* 73-2, Exhs. C – E. The arbitration award was confirmed, after a hearing, by the Chancery Division of the Superior Court of New Jersey. *See* 73-2, Exh. G. Actual litigation of the issues is clearly established by the record.

*Element three.* All three of these issues were also the subject of a final award on the merits. Judge Keefe issued an opinion on January 10, 2013. *See* Interim Award. The opinion was titled "Interim," but it was final except for two issues: First, the opinion ordered a valuation of the Hummer franchise as of January 1, 2007, so that Barna could be awarded 19.277% (his ownership percentage of PAM) of that value. Second, the opinion ordered that Mann and Barna be allowed to purchase the property on which PAM operates, and granted them time to arrange financing. *Id.* at 20-22. The Superior Court of New Jersey held a hearing, and subsequently confirmed the arbitration award. *See* 82-8, Exh. U; 73-2, Exh. F, G. Since the "Interim Award" was issued, the valuation has been completed, *see* 104, a subsequent award has been issued by the arbitrator, *See* 104-1, Exh. A, and that subsequent award has been confirmed by the Superior Court. 104-1, Exh. B.

The Estate Defendants argue that they intend to appeal Judge Keefe's award. *See* 108, 2, 3.[6] With respect to the valuation of the Hummer franchise, they suggest that the valuation was flawed: it failed to deduct "the cost of acquiring a corporate opportunity" from the eventual value of that opportunity. *See* No. 108, 2. With respect to 194 Realty, the Estate Defendants argue that the arbitrator did not have

---

[6]    New Jersey law gives litigants 45 days to appeal an order of the Superior Court. *See* Rules Governing the Courts of the State of New Jersey, 2:4-1. The final confirmation of the arbitration award was entered on September 19, 2014. The 45 day window for appealing closed on November 3, 2014. The appellate court may extend this period, based on a sufficient showing, for up to thirty days under Rule 2:4-4.

jurisdiction to award relief to Mann, see 108, 3. Those potential issues need not detain this Court. Even if the value assigned to the Hummer franchise is ultimately changed, the Arbitrator's determination as to Meyers's liability remains. Meyers's misappropriation of a corporate opportunity was a wrong, not just to Barna, but to all minority shareholders, including Mann. Judge Keefe's jurisdiction, or not, over Mann does not determine whether his award can be given preclusive effect.

*Elements four and five.* The fourth and fifth parts of the test are disposed of easily. All three issues were "essential to the prior judgment." They constituted major elements of Barna's claim, and were by no means incidental to it. The arbitrator ruled on them specifically. Finally, all of the parties against whom Meyers is seeking to invoke collateral estoppel were also named as defendants in the 2008 Barna action.[7]

### 3. Fairness considerations

In addition to the five factors outlined above, a court must consider more generally whether preclusion would be fair. "The application of offensive collateral estoppel is a discretionary matter for the court and as a rule of efficiency should not be applied unless the court is fully satisfied with its fairness." *Kortenhaus*, 549 A.2d 437, 439 (N.J. App. Div. 1988) (internal citations omitted).

Courts are particularly attentive to potential unfairness in cases of "offensive" rather than "defensive" collateral estoppel. When a defendant raises the estoppel bar against a plaintiff who previously lost the same

---

[7]     Barna ultimately named as defendants the Meyers Estate; the Meyers Trust; PAM; Paramus Hummer; Hummer of Mahwah; Pam Realty, LLC; 194 Realty; Antonio Fernandez, various minority shareholders of PAM; and Melody Paton. *See* Barna Complaint, 1. Mann's Complaint names all of the same defendants, except the minority shareholders of PAM, against whom he seeks no relief. *See* Complaint 1.

     Mann also has named three parties who were *not* parties to the Barna litigation: Cadillac of Mahwah, LLC and GMC-Pontiac of Mahwah, LLC. *See* Complaint, 1. As to them, collateral estoppel cannot be applied.

17

claim, the estoppel is said to be "defensive." *Kortenhaus*, 549 A.2d at 438); s*ee also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979). On the other hand, when a *plaintiff* attempts to bar a *defendant* from litigating an issue previously lost against another, separate plaintiff, the estoppel is "offensive." Here, Mann invokes offensive collateral estoppel. Mann seeks to bar defendants from relitigating issues they previously lost against another plaintiff, Barna.

Fairness concerns may play out differently as to defensive and offensive collateral estoppel. In general, collateral estoppel is intended to "protect litigants from the burden of relitigating an identical issue with the same party or his privy" and to "promote judicial economy by preventing needless litigation." *Parklane*, 439 U.S. at 326. Defensive collateral estoppel promotes judicial economy and fairness by denying a plaintiff the opportunity to serially relitigate identical issues by simply switching defendants. *Id.* at 329. Viewed prospectively, it gives the plaintiff an incentive to join all defendants in a single lawsuit for fear of losing the ability to sue them separately later. *Id.* at 329-330.

Offensive collateral estoppel, on the other hand, may frustrate those objectives under some circumstances. A potential plaintiff (P2) might hedge its bets by letting someone else (P1) sue first. If P1 is successful, P2 can jump on the bandwagon, file a separate action and invoke offensive collateral estoppel. If P1 is not successful, P2 may file another suit anyway (or wait to see what happens with P3, 4, and 5). Thus, unless a court polices the process for fairness, "offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action." *Id.* at 330.

The Estate Defendants make just such a fairness argument here. *See* Estate Def. Coll. Estop. Brief, 39-41. Mann, they say, could easily

have joined Barna's 2008 lawsuit; allowing Mann to invoke collateral estoppel now, they say, would be unfair. *Id.*

At some level of generality, the Estate Defendants have a point. IN *Parklane,* the Supreme Court cautioned that collateral estoppel may not be appropriate where a plaintiff could easily have joined the prior action. *See Parklane,* 439 U.S. at 331 ("in cases where a plaintiff could easily have joined in the earlier action...a trial judge should not allow the use of offensive collateral estoppel.").[8]

At the unfair end of the spectrum, said *Parklane,* is a case where P1 sues for small or nominal damages; in such a case, the defendant "may have little incentive to defend vigorously, particularly if future suits are not foreseeable." *Id.* at 330. Such a defendant, having made little effort to defend a small claim by P1, may be unfairly surprised when P2—who could and should have joined in the prior action—separately asserts a similar but much larger claim. In cases of multiple prior actions, there might be inconsistent determinations, from which future plaintiffs may pick and choose—also a potentially unfair situation.

Other situations, however, may fall at the fairer end of the spectrum. For example, perhaps the prior action was an SEC enforcement proceeding that P2 could not have joined even if P2 had wanted to. *Id.* at 332. To take a less extreme case, the Court may find that P2, although it theoretically could have joined the prior action, is

---

[8]     More specifically, *Parklane* raised four fairness issues. The first was the "wait and see" plaintiff discussed above. "The second argument against offensive use of collateral estoppel is that it may be unfair [because] ... [i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable....Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane,* 439 U.S. at 330-31.

19

not guilty of sharp practice. For example, the second action may not afford P2 any procedural opportunity that would not have been available in the first. *Id.*

The New Jersey courts have not wholly embraced *Parklane's* counsels of caution. Perhaps the high-water mark was *Batson v. Lederle Labs.*, 674 A.2d 1013, 1015-16 (App. Div. 1996), *aff'd in part as modified*, 702 A.2d 471 (N.J. 1997). There, the Appellate Division agreed with *Parklane* to the extent that, at least in theory, permitting a plaintiff to take a "wait and see" approach can be unfair.

*Batson* made it clear, however, that it did not interpret *Parklane* to impose a *per se rule*:

> The fact that plaintiff did not join her sister's case does not preclude her from invoking offensive collateral estoppel. Under the Restatement of Judgments 2d, § 29 (1982), cited with approval in *Kortenhaus v. Eli Lilly, supra*, 549 A.2d 437, one of the eight "circumstances" to be considered when a defendant wishes to relitigate an issue is whether: "(3) The person seeking to invoke favorable preclusion, or to avoid unfavorable preclusion, could have effected joinder in the first action between himself and his present adversary." *However, no New Jersey case has explicitly discussed or adopted this factor of the Restatement test as mandatorily disqualifying a party from claiming issue preclusion.*

*Batson*, 674 A.2d at 1015 (emphasis added); *id.* at n.4 (interpreting *Parklane* principle as a general, not an absolute rule).[9]

Indeed, *Batson* itself ultimately allowed a "wait and see" plaintiff to invoke collateral estoppel. That second plaintiff, it found, reaped no unfair advantage from waiting, and the defendant incurred no unfair disadvantage, because a second trial would have been a virtual rehash of the first:

---

[9]     *Parklane*, though influential, explicated federal common law. For the reasons expressed above, this case is governed by the New Jersey state law of collateral estoppel. And I do not read *Parklane* itself as a rigid bar to the assertion of collateral estoppel by a plaintiff who could have joined in the prior action. *See* 439 U.S. at 331 ("general" rule).

> In this case, [defendant] has not shown that permitting it to
> relitigate the knowledge issue would involve anything other
> than a duplication of the proofs presented in [the prior case].
> It has made no showing of new scientific evidence...or proof
> that its own records and former employee's testimony can be
> further rebutted, or anything else that would bring into
> doubt the collateral preclusionary effect of [the prior case's]
> finding. While joinder would have been the wiser initial
> course, defendant does not argue that plaintiff should be
> precluded from suing altogether, and there is no sound
> reason that plaintiff or the court system should be required
> to undergo the duplication of efforts regarding an issue
> settled, for now, in the [prior] case.

*Batson*, 674 A.2d at 1015-16.[10]

Taking into account these principles, I conclude that it is fair and appropriate to permit Mann to invoke collateral estoppel. Mann states that he did not join the original action because he could not prudently sue his then-employer. *See* Mann Reply Brief on Coll. Estop., 14. That makes intuitive sense. Barna, it is true, brought suit while he was still working at PAM. But Mann might have viewed matters differently, or may simply have been more risk-averse. Or the two men may have had different relationships with Meyer. Barna, who was for a time Meyer's son-in-law, seems to have enjoyed more leeway; for example, when he left the company for several months without explanation, Meyer continued to pay him a salary.

PAM, for its part, actually lends credence to Mann's account. IN connection with the ADEA claim, PAM cites Mann's role as a witness in Barna's lawsuit as a legitimate, nondiscriminatory reason for firing Mann. If appearing as a witness jeopardized Mann's employment, it

---

[10]    Even *Batson*'s equivocal endorsement of the *Parklane* disapproval of "wait and see" plaintiffs was thrown into doubt by the New Jersey Supreme Court's remand for a new trial, which explicitly declined to address the continuing precedential value of the Appellate Division's collateral estoppel holding. *See Batson v. Lederle Labs., a Div. of Am. Cyanamid Co.*, 702 A.2d 471, 472 (N.J. 1997).

follows that Barna's actually suing Meyers would have had a similar, if not greater, effect.

The timing also supports Mann's account. Mann was fired on April 24, 2010. He promptly filed a complaint of age discrimination with the EEOC in May 2010, and he filed his minority shareholder oppression suit promptly after that, on June 11, 2010. He received a right-to-sue letter from the EEOC in January 2011, and added the age discrimination claims to his lawsuit "promptly thereafter." *See* No. 87, 14. At the time, the Barna lawsuit/arbitration had been pending since 2008. It is not at all clear that Mann could have "easily" appended his name to Barna's arbitration in 2010.

In short, I am satisfied that Mann did not lightly bypass an earlier lawsuit that he could have "easily" joined. *Parklane,* 439 U.S. at 331. Nor are there indicia of an unfair "wait and see" approach. Mann did not await the result in the Barna lawsuit and then adopt a favorable result. To the contrary: Mann brought his lawsuit in 2010, and the first Barna arbitration award was not entered until 2013. In short, Mann sued on his own behalf reasonably promptly after being fired, at a time when the Barna lawsuit had not yet been resolved.

Finally, as in *Batson,* relitigation of the three issues decided in the Barna lawsuit would result in a simple rehash of that case. I see no indications of changed facts or circumstances, or of some defense unique to Mann that the defendants could assert here. In short, efficiency and the avoidance of inconsistent results favor, and general fairness does not subvert, the application of offensive collateral estoppel here.

I therefore will adopt and treat as established for purposes of this litigation issues 1, 2, and 3, described more fully above, involving the moving of the Hummer franchise, the purchase of the real estate in which PAM operated, and the SFE bonus money. Should the Barna judgment be altered or overturned on appeal, I will entertain an appropriate application.

### 4.  *The Fernandez defendants' collateral estoppel motion*

In motion no. 70, the four Fernandez Defendants invoke collateral estoppel against Mann as to the same three issues identified in the preceding section. The difference is that the Fernandez Defendants, unlike the Estate defendants, revailed on those issues in the Barna lawsuit. They seek to bar Mann from relitigating those as against the Fernandez defendants only. Mann essentially concedes that turnabout is fair play. I nevertheless discuss the issue briefly.

When Meyers moved the Hummer franchise, he transferred ownership of it to a corporation called Hummer of Mahwah, LLC. The 51% owner of that franchise was Antonio Fernandez. In 2008, GM discontinued its Hummer line. As a replacement, GM granted Hummer of Mahwah a Cadillac franchise. Mahwah Hummer, LLC then became Cadillac of Mahwah, LLC. Eventually, a GMC-Pontiac franchise was also established at the Mahwah location and named GMC-Pontiac of Mahwah, LLC. The real estate on which the dealership operates is owned by Mahwah Realty, LLC. These four defendants (Antonio Fernandez, Hummer of Mahwah, LLC, Cadillac of Mahwah, LLC, GM-Pontiac of Mahwah, LLC, and Hummer of Mahwah Realty, LLC) are collectively referred to as the "Fernandez defendants." *See* Fernandez Motion, 1-2.

The Fernandez defendants, named here, were also named in Barna's 2008 lawsuit. Barna alleged that the Fernandez defendants were liable in connection with the moving of the Hummer franchise, the SFE bonuses, and the purchase of the PAM property. Barna also alleged that GM had granted the Cadillac dealership to Hummer of Mahwah as a kind of compensation for the discontinuance of the Hummer franchise. *See* Fernandez Motion, 4. He therefore alleged that the formation of the Cadillac dealership and the GMC-Pontiac dealership were corporate opportunities belonging to PAM that were wrongfully diverted to Mahwah Hummer. *See* Fernandez Motion, 4.

The arbitrator, though, found that only Meyers (or rather his estate) was liable for each of these wrongs. *See* Fernandez Motion, 7-8; 10-12. The Fernandez defendants were cleared of these allegations.

Mann concedes that his claims against the Fernandez defendants are precluded by collateral estoppel. *See* ECF 80, 2. He requests only that the claims against the Fernandez defendants be dismissed without, rather than with, prejudice. That reservation of rights is based on the possibility of an appeal. Should the judgment on which both he and the Fernandez defendants rely be vacated, for example, Mann would seek to litigate the issues on the merits.

I will grant collateral estoppel as to the three issues identified above, and bar relitigation of them as against the Fernandez defendants. Should the Barna judgment be altered or overturned on appeal, I will entertain an appropriate application.

### B.   Age Discrimination Claims (Motions 71 and 72)

Mann asserts age discrimination claims against the Estate Defendants and PAM based on the federal ADEA as well as the NJLAD. In their summary judgment motions, the Estate Defendants argue that Meyers, as an individual natural person, is not amenable to suit under the age discrimination laws. As to the ADEA, I grant that motion; as to the NJLAD, however, I will deny it.

The Estate Defendants argue further that Mann is not an "employee" who may sue under federal and state age discrimination laws. PAM and the Estate Defendants argue that judgment should be granted in their favor on the merits of the age discrimination claims. Because these aspects of the summary judgment motions present issues of fact, I will deny them.

The surviving claims, then, are an ADEA claim against PAM and a NJLAD claim against the Estate Defendants and PAM for age discrimination.

24

### *1. Individual liability under age discrimination laws*

The Estate Defendants argue that Meyers (and by extension, his estate) is not a proper defendant under the ADEA or the NJLAD. Mann was employed by PAM, a corporation of which Meyers was the majority shareholder. Meyers, defendants point out, was not Mann's employer. Indeed an individual, they say, cannot be held liable as an "employer" under those age discrimination statutes. The Estate defendants are correct with respect to the ADEA, but not with respect to the NJLAD.

#### *(a) The ADEA*

Courts construe the meaning of "employer" or "employee" under the Age Discrimination in Employment Act in parallel with analogous provisions under the Americans with Disabilities Act and Title VII of the Civil Rights Act. *See Dejoy v. Comcast Cable Communications Inc.*, 941 F.Supp. 468, 474 (1996) ("Courts, including the Third Circuit, routinely use the case law under the three statutes interchangeably."); *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1280 (7th Cir. 1995); *Kohn v. AT&T Corp*, 58 F.Supp.2d 393 (D. N.J. 1999). I will therefore refer to case law interpreting all three statutes in my discussion.

Third Circuit law is clear that individual persons are not personally liable under Title VII. In *Emerson v. Thiel College*, 296 F.3d 184 (3d Cir. 2002), a former student brought suit under Title VII against a college, its president, its vice president of academic affairs, and members of the faculty and staff. *Id.* at 186. The Third Circuit upheld dismissal of the claim against the individual defendants because "individual employees are not liable under Title VII." *Id.* at 190. *See also Dici v. Com. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) ("individual employees cannot be held liable under Title VII."); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) ("we are persuaded that Congress did not intend to hold individual employees liable under Title VII.").

Courts in this district have similarly held that individuals are not liable under the ADEA. In *DeJoy v. Comcast Cable Commc'ns Inc.*, 941 F. Supp. 468 (D.N.J. 1996), an employee of Comcast brought suit under ADA and ADEA against the president and vice president of Comcast. *Id.* at 470, 473. The district court held that the definition of "employer" was common to ADA, ADEA, and Title VII. *Id.* at 475 (citing *Sheridan*, 100 F.3d at 1453). *See also Crawford v. W. Jersey Health Sys. (Voorhees Div.)*, 847 F. Supp. 1232, 1237 (D.N.J. 1994) ("Therefore, the court holds that under Title VII and the ADEA, [the defendant] cannot be individually liable.").

Courts of Appeals for other Circuits have reached the same conclusion. *See Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587-88 (9th Cir. 1993) (Thus, this court's ruling...that individual defendants cannot be held liable for damages under Title VII is good law, and, because of the similarities in the Title VII and ADEA statutory schemes, is applicable to suits under the ADEA.") (footnotes omitted); *Smith v. Lomax*, 45 F.3d 402, 403–04 & n. 4 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir.); *Martin v. Chem. Bank*, No. 95-9015, 1997 WL 701359 at *3 (2d Cir. Nov. 10, 1997); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1280 (7th Cir. 1995).

In short, the precedents overwhelmingly establish that individuals are not personally liable under the ADEA.

I consider whether an "individual" who, like Meyers, is a controlling shareholder, might merit different treatment. Case law, however, including cases from the district courts in this Circuit, have declined that invitation. They have held that an individual, even if a sole owner of the business, cannot be liable as an "employer." For example, in *Larmore v. RCP/JAS, Inc.*, No. 97-5330, 1998 WL 372647 (E.D. Pa. May 19, 1998), a defendant was the president and sole shareholder of a car dealership. The court held that even such a controlling owner could not

26

be held individually liable under Title VII. *Id.* at \*2. In *Matheson v. Virgin Islands Cmty. Bank, Corp.*, 297 F. Supp. 2d 819 (D.V.I. 2003), an employee sued the bank where he worked, and also the bank's "sole shareholder." *Id.* at 822. That district court held that the defendant could not be held personally liable. *Id.* at 832 ("the Court is satisfied that Prosser, as sole shareholder, cannot be held individually liable for any alleged discrimination under Title VII or the ADEA."). *See also Humphreys v. Med. Towers, Ltd.*, 893 F. Supp. 672, 688 (S.D. Tex. 1995) *aff'd without opinion*, 100 F.3d 952 (5th Cir. 1996) (sole shareholder not personally liable); *Jones v. Boyle*, CIV.A. 08-3062 KSH, 2011 WL 2607168 at \*3 (D.N.J. June 30, 2011) *aff'd on other grounds*, 459 F. App'x 71 (3d Cir. 2012) (owner of the business not personally liable); *Weeks v. Leeward Islands Apothecaries*, CIV.A. 09-0050, 2011 WL 612734 at \*3 (D.V.I. Feb. 11, 2011) (joint owners of the business not personally liable); *Milliner v. Enck*, CIV. A. 98-CV-467, 1998 WL 303725 (E.D. Pa. May 7, 1998) (three joint owners of the company not personally liable).

I agree with those courts' analysis. Meyers did not personally employ Mann. Rather, PAM employed Mann and Meyers was PAM's majority shareholder. Mann Stmt Undisputed Facts, ¶7-14. The ADEA creates liability for employers, not individuals—even controlling individuals—acting on behalf of the employer. *See* 29 U.S.C. § 623(a) ("It shall be unlawful for an *employer*...") (emphasis added). The statutory language is enough to persuade me, but I note the statutory context as well. Potentially liable employers under ADEA are limited to those with more than twenty employees. 29 U.S.C. § 630(b). Courts have interpreted this limitation to mean that Congress did not wish to impose the burden of litigation upon small entities. If employers consisting of nineteen persons are exempt, it seems incongruous that individual shareholders or agents would be liable. *See Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583,

587 (9th Cir. 1993) ("If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees."). *See also Sheridan,* 100 F.3d at 1077-78 (Third Circuit accepts similar argument as to the minimum employee thresholds in Title VII).

True, "employer" is defined to include not only the employer but its "agent." *See* 29 U.S.C. § 630(b)(1) ("The term [*i.e.,* 'employer'] also means (1) any agent of such a person"). As to Title VII, the Third Circuit cited the "agent" definitional language, but nevertheless found an unequivocal legislative intent that damages would not be assessed against "individuals who are not themselves the employing entity." *Sheridan,* 100 F.3d at 1077 (upholding dismissal of Title VII claims against supervisory employee). It is likely that this definitional language was meant to create respondeat superior liability, not to subject agents themselves to personal liability. Several courts have so interpreted it. *See EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d at 1281; *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d at 510; *Miller,* 991 F.2d at 587.[11]

Meyers cannot be held individually liable under the ADEA. Summary judgment will be granted and the Twelfth and Fourteenth Counts will be dismissed with respect to The Estate of Eugene C. Meyers and Melody Patton as executrix.

### (b) The NJLAD

Unlike the ADEA, the NJLAD does permit individual liability, albeit by the awkward route of "aiding and abetting." The Act makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J. STAT. ANN. § 10:5-12 (e). *See Cicchetti v. Morris Cnty. Sheriff's Office,* 947 A.2d 626, 645 (2008) ("individual liability of a supervisor for

---

[11]    Mann has made no argument, and adduced no facts, to suggest piercing of the corporate veil to reach Meyers.

acts of discrimination or for creating or maintaining a hostile
environment can only arise through the 'aiding and abetting' mechanism
that applies to 'any person.'").

Here, Meyers is alleged to have performed acts of discrimination
himself, not through another. Aiding and abetting, in its classic sense, is
an uneasy fit. New Jersey's Appellate Division, however, has held that an
individual can be held liable under the aiding and abetting provision
even where the individual performed the acts of discrimination himself.
The LAD, the Appellate Division held, is "broad and pervasive." *Rowan*,
2013 WL 1350095 at *8 (internal quotations omitted). In enacting the
LAD, the legislature intended to "eradicate the cancer of discrimination
in the workplace." *Id.* (internal quotations and alterations omitted). The
statute should therefore be "liberally construed to effectuate" that
purpose. *Id.* (internal quotations omitted).

It may seem awkward, or even a legal fiction, to say that a person
can aid and abet his own conduct.[12] The case law, however, finds it at
least as awkward to say that a person can be held liable for aiding and
abetting another individual's discrimination, but cannot be held liable for
his own. *See Rowan*, 2013 WL 1350095 at *8 ("any suggestion that
N.J.S.A. 10:5–12(e) permits individual liability for a supervisor who
encourages or facilitates another employee's harassing conduct, while
precluding individual liability for the supervisor based on his or her own
discriminatory or harassing conduct, appears to us to be untenable.").

When interpreting the NJLAD, I am bound by state authority.
Since *Rowan*, courts in this district have held that a supervisor can be
personally liable for his own conduct under the aiding and abetting
provision of the LAD. *See Brown-Marshall v. Roche Diagnostics Corp.*, No.

---

[12]    Meyers might be said to have aided and abetted PAM, the corporation,
But a corporation can act only through persons. To say that a corporate officer,
agent, or shareholder, through his own official acts, aided and abetted the
corporation, is to create a self-proving, even tautological theory of liability. In
short, this theory offers no escape from the paradox identified above.

10-cv-5984, 2013 WL 3793622 at *2-3, 7 (D.N.J. July 19, 2013), (holding a supervisor personally liable for the employer's terminating the employee on the basis of age and race, even though the discriminatory conduct was committed by the supervisor himself); *Regis v. Int'l Paper Co.*, No. 12-cv-7549, 2013 WL 5410700, at *4-5 (D.N.J. Sept. 26, 2013); *Godfrey v. Thermco*, No. 13-cv-4750, 2013 WL 5952046, at *5-6 (D.N.J. Nov. 4, 2013); *Longo v. Purdue Pharma, L.P.*, No. 14-cv-1204, 2014 WL 2800817, at *7 (D.N.J. June 19, 2014).

I will follow those precedents. Meyers (and by extension his Estate) is a proper defendant for Mann's discrimination claims under the LAD.

### 2. *Mann's status as "employee"*

Both ADEA and NJLAD statutes create a cause of action for an "employee." The Estate Defendants argue that Mann is not eligible to bring a claim under those statutes because he was not an "employee." *See* Estate Defendants ADEA Motion, 26-30. Indeed, the Estate contends, Mann is more properly viewed as an employer himself. *See* Estate Defendants ADEA Motion, 26.

To determine whether an individual is an employee for purposes of federal discrimination law, courts use a six factor test outlined by the Supreme Court in *Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003). Those factors are:

1) "Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work";

2) "Whether and, if so, to what extent the organization supervises the individual's work";

3) "Whether the individual reports to someone higher in the organization";

4) "Whether and, if so, to what extent the individual is able to influence the organization";

30

5) "Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts";

6) "Whether the individual shares in the profits, losses, and liabilities of the organization."

*Id.* at 449-50 (internal quotations omitted).

Perhaps any six-factor test is fertile ground for material issues of fact. Mann has identified several pieces of evidence that create a genuine issue as to his employment status. I do not prejudge the merits, but on summary judgment I cannot find that Mann was not an "employee."

For example, the sixth *Clackamas* factor asks whether the individual shares in the profits, losses, and liabilities of the organization. *Clackamas*, 538 U.S. at 450. No one appears to contend that Mann shared in the losses and liabilities of the corporation. *See* Mann ADEA Brief, 18. As to profits, the situation is muddled. Meyers testified in deposition that the profits of the company were never distributed to shareholders in proportion to their percentage ownership in the firm. *See* Meyers Deposition, 79-80. The company did, however, distribute profits in the form of year-end bonuses based on job performance. *See* Meyers Deposition, 66-67, 72-73, 76, 79-80.

Likewise, Mann has identified an issue of fact with respect to the fourth factor: the extent of his ability to influence the organization. This factor is closely allied with the question of control, which is the "principal guidepost that should be followed." *Clackamas*, 538 U.S. at 448. Mann has submitted evidence that he was unable to stop the dealership from taking actions that Mann opposed. Mann opposed the moving of the Hummer franchise. *See* Mann 2013 Deposition, 20-21. Mann was unable to fire an employee when Meyers objected. *See* Hanley Deposition, 24-25. And of course Mann himself was eventually fired. *See* Estate Defendants' Response, ¶ 42. Mann was not a director of PAM; its board of directors consisted of Meyers himself. *See* Mann 2009 Deposition, 138-139. At all

31

relevant times, Meyers held a controlling 2/3 majority of the company's shares. *See* Mann Stmt Undisputed Facts, ¶ 13-14.

There is evidence that, to the extent that Mann was able to influence the organization, he did so at the pleasure of Meyers. *See Mariotti*, 714 F.3d 768 (a court must take into account "not only the authority [the individual] wields within the enterprise but also the source of that authority. Specifically, we must consider whether Plaintiff exercises the authority by right, or whether he exercises it by delegation at the pleasure of others who ultimately do possess the right to control the enterprise.").

It is undisputed that Mann reported to Meyers, a person of higher authority in the organization (the third *Clackamas* factor). *See* Mann Counterstatement, ¶ 71; Estate Defendants' Response, ¶ 71. There is some dispute, however, about the extent to which Meyers supervised Mann (the second *Clackamas* factor). One day before Mann was terminated, Meyers directed that Mann increase his hours. *See* Estate Defendants' Response, ¶ 41. On the other hand, Mann testifies that Meyers "was not involved in the day to day operations and instead, acted in an oversight capacity making all major decisions pertaining to the company direction and its financial efforts." *See* Mann Stmt Undisputed Facts, ¶ 5.

Mann's status, then, does not closely resemble that of individuals who have been found not to be employees as a matter of law. *See Clackamas*, 538 U.S. at 442 (individual in question was a shareholder-director); *Solon v. Kaplan*, 398 F.3d 629, 633 (7th Cir. 2005) (individual was one of four general partners, all of whom had equal voting power); *Mariotti v. Mariotti Bldg. Products, Inc.*, 714 F.3d 761, 763 (3d Cir. 2013) (individual was a shareholder, officer, vice-president, secretary, and a member of the board of directors of a closely held family business); *Ziegler v. Anesthesia Associates of Lancaster, Ltd.*, 74 F. App'x 197, 200

(3d Cir. 2003) (individual was one of 19 shareholders, each of whom had equal ownership and voting rights in "virtually all matters").

There are genuine, evidence-backed disputes about important elements of the *Clackamas* test. I therefore cannot find, on summary judgment, that Mann was not employee for purposes of the federal ADEA.

New Jersey courts have used the *Clackamas* test to determine whether an individual is an "employee" under New Jersey's Conscientious Employee Protection Act. *See Feldman v. Hunterdon Radiological Associates*, 901 A.2d 322 (N.J. 2006). They have not, however, explicitly adopted *Clackamas* as the test for whether a person is an employee under the NJLAD. The issues of fact identified above, however, remain highly relevant. I likewise cannot find, on summary judgment, that Mann is not an employee under the NJLAD.

### 4. *Summary Judgment on the Merits of the Age Discrimination Claims*

PAM and the Estate Defendants seek summary judgment on the merits of the age discrimination claims. *See* 71-4; 72; 85. Summary judgment is not appropriate and will be denied.

#### (a) *Legal standard*

Summary judgment in employment discrimination cases is subject to the analytic framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Rather than remain on the moving party, the burdens of production and persuasion may shift. *Id.*

Initially, a plaintiff must state a colorable prima facie claim for relief under the ADEA: that plaintiff is forty years of age or older, that the defendant took an adverse employment action, that plaintiff was qualified to hold the position in question, and that plaintiff was replaced by a

33

sufficiently younger employee. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

Once the plaintiff has made out a prima facie case, the burden of production (not persuasion) shifts to the defendant. The defendant must "offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). That is a "relatively light burden." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). It is not necessary for the employer to prove that the purported reason was the actual reason the employee was terminated. *See Id.* ("The employer need not prove that the tendered reason actually motivated its behavior."). The employer must simply present evidence from which a reasonable factfinder could conclude that the reason for the termination was non-discriminatory. *Id.* at 763 ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.").

If the defendant satisfies that requirement, the burden shifts back to the plaintiff. To survive summary judgment, the plaintiff must then submit evidence from which a factfinder could reasonably do one of the following: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Keller*, 130 F.3d at 1108.

New Jersey courts likewise use the *McDonnell-Douglas* burden-shifting framework in evaluating claims of discrimination under the NJLAD. *See O'Brien v. Telcordia Technologies, Inc.*, 20 A.3d 1154, 1158-59 (N.J. App. Div. 2011); *Reynolds v. Palnut Co.*, 748 A.2d 1216, 1219 (N.J. App. Div. 2000).

34

### (b)  Application to Mann's Evidence

Mann has made out a prima facie case of age discrimination. He has introduced evidence or testimony that he is forty years of age or older and that PAM terminated his employment, *see* Complaint ¶ 76, 78; that he was qualified for his position, *see* Complaint ¶ 20; Mann 2013 Declaration, ¶ 3; and that he was replaced by younger employees, *see* Complaint ¶ 147; Mann Counterstatement, ¶¶ 44-45.

The burden of production thus shifts to defendants Meyers and PAM. They must offer evidence from which a factfinder could conclude that there were legitimate, nondiscriminatory reasons to discharge Mann. *Keller*, 130 F.3d at 1108. The defendants have met that burden. They attribute Mann's dismissal to tension over the moving of the Hummer franchise, and over Mann's testimony in Barna's lawsuit. *See* ADEA Motion, 17. In addition, they point to evidence that employees working under Mann were dissatisfied with his performance. Attached to defendants' papers are signed letters from members of Mann's staff stating that the workplace had become unproductive and hostile as a result of Mann's actions. *See* Statements Regarding Tom Mann; Estate Defendants ADEA Motion, 10, 11, 17.

The burden of persuasion therefore shifts back to Mann. He must submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Keller*, 130 F.3d at 1108. Under this standard, a plaintiff must "point to evidence that proves age discrimination in the same way that critical facts are generally proved—based solely on the natural probative force of the evidence." *Id.* at 1111.

Mann has discharged that burden. He has provided evidence from which a factfinder could believe that age discrimination was a motivating

factor in the decision to terminate him. Mann testified that Meyers made disparaging remarks toward him on an "almost daily basis," focusing on "what Gene expressed as my being too old to run the dealership and that I should retire." *See* Mann 2014 Declaration, ¶¶ 4-5. "On the sales floor and at sales meetings, Gene insulted me with comments that I was 'over the hill', that I had 'lost a step', that I was 'shot', that I 'should retire', that I needed 'putty' from a funeral parlor to hid my wrinkles, that I should dye my grey hair, that I should 'step down' and let my younger brother Bobby take over, that I was 'tired' and that I was 'all washed up and should let someone younger take over.'" *Id.* at ¶ 8. Other witnesses, too, testified that they heard Meyers make such comments toward Mann. *See* Rosso Declaration, ¶ 1; Armanico Declaration, ¶ 1; William Mann Declaration, ¶ 9.

Mann also offered testimony that Meyers wrote ageist comments on a pad in the show room, on showroom forms, and on "newspaper ads and whatever was available to him at the time." *See* William Mann Declaration, ¶ 2; Mann 2013 Deposition, 34-35, 39. Mann testified that Meyer left a written, age-discriminatory comment in Mann's office every day for "[a]pproximately 600 days." *See* Mann 2013 Deposition, 38; Rosso Declaration, ¶ 6.

All of this evidence, if believed, could lead a reasonable factfinder to conclude that age-based discrimination was "a motivating or determinative cause" of Mann's termination.

Clearly, genuine material issues of fact honeycomb the age discrimination claims. Summary judgment is not appropriate on the merits of the claims under the ADEA or the NJLAD, and it will be denied.

36

## IV.   Conclusion

I therefore will order the following. The ADEA claims will be dismissed as against the Estate Defendants because Meyers was not an "employer." Summary judgment is granted to the extent that issues 1, 2, and 3, described at pp. 12-13, *supra,* will be given collateral estoppel effect in this action. The summary judgment motions are otherwise denied.

Dated: November 21, 2014
Newark, New Jersey

**HON. KEVIN MCNULTY**
**United States District Judge**

37